# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ROBIN PILUS, | ) | CASE NO. 3:20-CV-01652 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| KILOLO KIHAKAZI, | ) | JONATHAN D. GREENBERG |
| Acting Commissioner of Social Security, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

Plaintiff, Robin Pilus ("Plaintiff" or "Pilus"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

that the Commissioner's final decision be VACATED and REMANDED for further consideration consistent with this Report & Recommendation.

## I.  PROCEDURAL HISTORY

On April 2, 2018, Pilus filed an application for DIB and SSI, alleging a disability onset date of July 7, 2017, and claiming she was disabled due to back injury, neck injury, arthritis, diabetes, and depression.  (Transcript ("Tr.") at 81, 249-61.)  The applications were denied initially and upon reconsideration, and Pilus requested a hearing before an administrative law judge ("ALJ").  (Tr. 190-1.)  On June 12, 2019, an ALJ held a hearing, during which Pilus, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 33-77.)  On July 17, 2019, the ALJ issued a written decision finding Pilus was not disabled.  (*Id.* at 12-32.)  The ALJ's decision became final on May 27, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On July 27, 2020, Pilus filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 14, 15.)  Pilus asserts the following assignments of error:

(1)  The ALJ committed harmful error when he failed to properly evaluate the evidence in this matter and found the opinion of the treating source not persuasive.

(2)  The ALJ committed harmful error in his determination regarding credibility as it was not supported by substantial evidence and violated Social Security Ruling 16-3p.

(3)  The ALJ committed harmful error when he did not meet his burden at Step Five of the Sequential Evaluation.

(Doc. No. 13 at 1.)

2

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Pilus was born in 1980 and was 37 years-old at the time of her alleged disability onset date, making her a "younger individual" under social security regulations at all relevant times.  (Tr. 25.) *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has at least a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a State Trained Nurse Assistant ("STNA").  (*Id.* at 25.)

### B.    Relevant Medical Evidence[2]

#### 1.    Mental Impairments

On June 20, 2018, psychological consultative examiner Wayne Morse , Ph.D., examined Pilus and diagnosed major depressive disorder single episode - moderate, panic disorder, generalized anxiety disorder, obsessive-compulsive disorder, and posttraumatic stress disorder with derealization. (Tr. 508-512.)  On examination, Pilus could correctly repeat 2 out of 6 numbers on a digits forward exercise, and 0 out of 5 numbers on a digits backwards exercise.  (*Id.* at 510.)  She remembered 4 out of 5 words on a memory recall test.  (*Id.*)  Dr. Morse assessed her cognitive function in the average range, and noted good insight, awareness of her psychopathology, and good judgment.  (*Id.*)

On July 9, 2018, Pilus had a psychiatric diagnostic evaluation with Carolyn Bing Nieset, LISW, for her major depressive disorder and mood disorder.  (*Id.* at 542-3.)  Ms. Nieset recommended EMDR therapy.  (*Id.*)

---

[2]    The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

From August 2018 through March 2019, Pilus underwent EMDR therapy with Ms. Nieset. (*Id.* at 542-52, 588-9.)

On May 22, 2019, Ms. Nieset completed a mental impairment questionnaire, and opined Pilus was "unable to meet competitive standards" in maintaining attention and concentration for extended periods, and "seriously limited but not precluded" in the following areas:

- carry out detailed instructions;

- manage regular attendance and be punctual;

- sustain an ordinary routine without special supervision;

- complete a normal work day and work week without interruption from psychologically based symptoms;

- perform at a consistent pace without an unreasonable number and length of rest periods; and

- understand and remember detailed instructions.

She also opined Pilus would be off-task half of an 8-hour work day.  (*Id.* at 641-2.)

### 2.    Physical Impairments

On April 20, 2016, Pilus sought treatment from Dr. Brendan Bauer of Advanced Neurologic Associates for her low back and leg pain, numbness, weakness, and loss of sensation.  (Tr. 381-85.) Dr. Bauer assessed Pilus with degenerative disc disease lumbar spine and lumbar radiculopathy.  (*Id.* at 383.)  He ordered an electromyograph evaluation of her lower extremities and an MRI of her lumbar spine.  (*Id.* at 384.)

On June 15, 2016, Pilus underwent an MRI study of her spine, which showed the alignment was maintained on the sagittal images, no compression fractures were seen, and there were minor degenerative endplate signal changes present at the lumbosacral junction.  (*Id.* at 439.)

4

On June 29, 2016, Pilus had an epidural injection for treatment of her chronic low back pain. She reported a pain level of 8 out of 10. (*Id.* at 387-9.)

On August 24, 2016, Pilus returned to Dr. Bauer and reported the epidural injection was only minimally effective, reducing her pain from a 9 to an 8 out of 10. (*Id.* at 392.) She reported the pain on her right side never went away, and Oxycontin did not help with the pain, and made her tired, nauseous, and groggy. (*Id.*) Dr. Bauer noted the MRI showed diffuse posterior disc bulging at L4/5 increased since 2012 with mild central spinal canal stenosis and mild right and left lateral recess narrowing at that level; as well as increased disc space narrowing at L5/S1, broad based posterior disc herniation, additional neural foraminal narrowing, and moderate central canal stenosis and significant right and left lateral recess narrowing at that level. (*Id.* at 394-5.)

On September 16, 2016, Pilus had an epidural injection for treatment of her chronic low back pain. (*Id.* at 397-9.) She reported a pain level of 7 out of 10. (*Id.*)

On October 14, 2016, Pilus returned to Dr. Bauer and reported the epidural injection had started to wear off in the past couple of days. (*Id.* at 401.) Dr. Bauer noted he would arrange additional epidural injections "due to intractable lumbar pain which is not responding to medical management and conservative treatment including medications and physical therapy." (*Id.* at 404.)

On December 9, 2016, Pilus had an epidural injection for treatment of her chronic low back pain. (*Id.* at 405-7.) She reported a pain level of 5 out of 10. (*Id.*)

On March 16, 2017, Pilus returned to Dr. Bauer and reported a pain level of 7 out of 10, but explained her back pain varied with activity. (*Id.* at 409.) Dr. Bauer's assessment was modified to include lumbar pain and right lower extremity paresthesias due to radiculopathy and underlying posterior disc bulging at L4/5. (*Id.* at 412.) Dr. Bauer noted he would again arrange additional

5

epidural injections "due to intractable lumbar pain which is not responding to medical management and conservative treatment including medications and physical therapy."  (*Id.*)

On April 6, 2017, Pilus had an epidural injection for treatment of her chronic low back pain.  (*Id.* at 414-6.)  She reported a pain level of 8 out of 10. (*Id.*)

On June 28, 2017, Pilus sought treatment at at Fireland Regional Medical Center for lower back pain.  (*Id.* at 456-1.)  An MRI was ordered, which demonstrated lower lumbar discovertebral degenerative changes with associate disc protrusions. (*Id.* at 460-1.)

On July 14, 2017, Pilus sought treatment at Bellevue Hospital Emergency room for increasing right leg pain related to a history of a herniated disc in her back and chronic sciatica.  (*Id.* at 352.)  She was prescribed Percocet and Prednisone.  (*Id.* at 354.)

On July 18, 2017, Pilus returned to Dr. Bauer and reported a pain level of 9 out of 10.  (*Id.* at 417.)

On July 21, 2017, Pilus had an epidural injection for treatment of her chronic low back pain.  (*Id.* at 422-4.)

On July 26, 2017, Pilus had an epidural injection for treatment of her chronic low back pain.  (*Id.* at 426-9.)  She reported a pain level of 9 out of 10. (*Id.*)

On August 2, 2017, an MRI scan of Pilus' spine showed continued mild disc space narrowing at the lumbrosacral junction, mild degenerative endplate signal changes at the lumbosacral junction, scoliosis at the SI joints, slight loss of disc height at L1-2, and disc desiccation at L4-5.  (*Id.* at 460-1.)

On August 3, 2017, Pilus returned to Dr. Bauer for a follow up visit.  (*Id.* at 431.)  She reported the latest injections had not decreased her pain, which was still at a pain level of 8 out of

6

10 and numbness and tingling in her right foot, causing difficulty walking any distance. (*Id.* at 431-3.) Dr. Bauer noted Pilus' body mass index ("BMI"), was 44.28. (*Id.* at 432.)

On September 27, 2017, Pilus underwent an L5/S1 right microdiscectomy for her disc herniation and radiculopathy. (*Id.* at 484-5.) Surgeon Bo Yoon noted Pilus had "failed conservative treatment." (*Id.*)

On December 27, 2017, Pilus saw Dr. Kaftan for a thyroid check. (*Id.* at 475.) Her BMI was 47.7, and lab results revealed that her hemoglobin A1C level was 5.7 and she was prediabetic. (*Id.* at 473.) Dr. Kaftan prescribed Metformin. (*Id.*)

On January 11, 2018, Pilus returned to Dr. Bauer, reporting the surgery had reduced her radicular pain, but she still had lower back pain, and her right hand kept going to sleep. (*Id.* at 598-600.) Dr. Bauer ordered an EMG, which showed a right C5/6 radiculopathy, likely due to disc protrusion, stenosis, or facets. (*Id.* at 608.)

On January 25, 2018, an EMG was consistent with a remote C5/6 motor radiculopathy on the right. (*Id.* at 601-3.)

From March 5, 2018 through April 20, 2018, Pilus underwent 5 sessions of physical therapy at Firelands Regional Medical Center. (*Id.* at 560-6, 573-8.) She cancelled her remaining sessions due to having a cervical MRI scheduled and wishing to pursue other options. (*Id.* at 578.) The discharge summary noted Pilus "had noted small decrease in overall pain levels with improved cervical ROM and improved postural awareness since starting therapy, but still continued to experience numbness and tingling in the [right upper extremity]." (*Id.*)

On May 1, 2018, Pilus received trigger point injections at the right C4 vertebra at Dr. Bauer's office. (*Id.* at 609.)

On May 10, 2018, Pilus completed a Function Report.  (*Id.* at 304-11.)  She reported that she was unable to stand or sit for periods of time,  her right arm was weak and tingly, and her right hand was numb and tingly, causing her to drop things often.  (*Id.* at 304.)  Her depression and pain caused her to withdraw from social events, and she had no social life besides events with her children.  (*Id.* at 309. )  She explained, "my whole life had changed.  Pain causes me from not doing my job I did for over 15 years."  (*Id.* at 311.)

On May 21, 2018, an MRI of Pilus' cervical spine revealed minimal degenerative changes of the cervical spine with a mild left-sided neural foraminal narrowing at C3/4 and mild spinal canal stenosis at C5/6 and C6/7 vertebrae.  (*Id.* at 488-9.)

On May 21, 2018, Pilus saw her primary care physician, Dr. G. Robert Kaftan, to follow up on starting metaformin and Cymbalta.  (*Id.* at 494.)  She was not satisfied with either medication, and wanted to know her sugar count to see if really needed Metformin .  (*Id*.)  Dr. Kaftan assessed her with prediabetes, depression, fatigue, and cervicalgia.  (*Id.* at 493.)

On June 5, 2018, Pilus returned to Dr. Bauer's office and reported from her right shoulder down to the hand was always tingling and "asleep."  (*Id.* at 612.)  She reported her lumbar pain was 4 or 5 out of 10, with medication, and worsened with walking and bending.  (*Id*.)  She received a brachial plexus injection.

On June 13, 2018, Dr. Marsha Cooper completed a physical consultative examination and noted that Pilus was a morbidly obese female whose chief complaint was chronic low back pain along with radicular pain in her upper extremity associated with neck pain.  Dr. Cooper opined that Pilus should no longer work as a nurse, and was limited to sedentary work which would allow her the ability to get up as needed every two hours. (*Id.* at 497-503.)

8

On June 27, 2018, Pilus had diagnostic imaging taken of her thyroid. She was diagnosed with a goiter.  (*Id.* at 536.)

On July 27, 2018, Pilus was evaluated by endocrinologist M. Cecilia Lansang, M.D., for thyroid nodule.  (*Id.* at 520.)  Dr. Lansang noted one nodule was a cyst, and the others were "subcm nodules." (*Id.* at 522.)  She recommended shifting from metaformin to metaformin ER.  (*Id.*)

On September 13 and 27, 2018, Pilus returned to Dr. Kaftan for treatment of her physical problems and depression.  (*Id.* at 528, 531.)

On September 21, 2018, Pilus received additional trigger point injections at the right C5/6 and C7/8 vertebrae.  (*Id.* at 622.)

On November 14, 2018, Dr. Bauer diagnosed Pilus with trochanteric bursitis in both hips. (*Id.* at 629.)

On February 13, 2019, Pilus received additional trigger point injections in the right L4/5 and L5/S1 vertebrae.  (*Id.* at 633.)

**C.**     **State Agency Reports**

**1.**     **Mental Impairments**

On June 28, 2018, State agency reviewing psychologist Joseph Edwards, Ph.D., reviewed the record and opined that Pilus had the following mental residual functional limitations:

- moderately limited ability to maintain attention and concentration for extended periods,

- moderately limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms,

- can perform 1 to 4 step tasks without fast paced demands,

- moderately limited ability to perform at a consistent pace without an unreasonable number and length of rest periods, and

- moderately limited ability to respond appropriately to changes in the work setting.

(Tr. 93-5.)

On October 29, 2018, State agency reviewing psychologist Robert Baker, Ph.D., reviewed the record and concurred with the opinion of Dr. Edwards, with the following exceptions:

- moderately limited ability to interact appropriately with the general public;

- limited to superficial contact with the general public

- may need occasional flexibility with breaks when experiencing increased symptoms; and

- would do best in a setting without major or frequent changes to work routine.

(*Id.* at 148-50.)

### 2.    Physical Impairments

On July 1, 2018, State agency reviewing physician Timothy Budnik, D.O., reviewed the file and opined that Pilus had the following functional limitations:

- occasionally lift or carry 20 pounds;

- frequently lift or carry 10 pounds;

- stand or walk for two hours in an eight-hour day;

- sit for six hours in an eight-hour day;

- occasionally crawl, crouch, kneel, stoop, and climb ramps or stairs;

- never climb ladders, ropes, or scaffolds;

- limited reaching overhead;

- limited right handling and fingering; and

10

- must avoid all exposure to hazards.

(*Id.* at 91-2, 109.)

On October 15, 2018, State agency reviewing physician Kalpna Desai, M.D., reviewed the

file and concurred with the opinion of Dr. Budnik, with the exception that Dr. Desai reduced the

standing or walking limitation to four hours in an eight-hour day. (*Id.* at 146-8.)

**D.  Hearing Testimony**

During the June 12, 2019 hearing, Pilus testified to the following:

- She is single, and lives with her two sons, ages 14 and 8. She is right hand dominant. (Tr. 38.)

- She has income is from part-time work, and receives food stamps and Medicaid. (*Id.* at 39.)

- She has a driver's license and drives regularly. (*Id.*)

- She is currently performing part time work as an overnight aide to people who are mentally disabled. She works 11 hours a week. (*Id.* at 39-40.)

- She had previously worked up to 20 hours a week, but reduced her hours on her doctor's advice. (*Id.* at 41.)

- She worked as a STNA for 16 years. She thinks her license is no longer active. She was a hospital aide at the Ohio Veterans' Home. She stopped working at the VA on July 7, 2017, but received disability pay for some time after that. The job involved lifting heavy patients. (*Id.* at 40-2.)

- Before she worked at the Veterans' Home, she worked as an STNA at other facilities. (*Id.* at 43-4.)

- She stopped working at the Veteran's home because she could not handle the eight to 16-hour shifts required. She couldn't life a patient and risk having them fall because her right arm gave out. (*Id.* at 45.)

- Her current work requires waking the client, and verbally prompting her to shower, get dresses, and get on the bus to work. She makes the client a simple breakfast. (*Id.* at 45-6.)

11

- She first injured her lower back in 2005 when she was injured while moving a patient with a Hoyer lift at Concord Care.  That led to a worker's comp claim.  (*Id.* at 47-8.)

- After the discectomy of her lower back in 2017, she began noticing tingling and numbness in her right arm.  She was dropping things all the time and her fingers were weak.  She assumed it was a complication from the surgery.  (*Id.* at 49.)

- She had two months of physical therapy, but it did not help.  She also receives trigger shots, which relieve the pain somewhat, and last for about eight weeks.  But they are very painful when you get them.  (*Id.* at 50.)

- Her neurologist recommended another surgery to treat her lower back pain, but she chose not to do that, and to stick with the injections.  (*Id.* at 54.)

- She used to be very social, but now is more isolated.  She attends her children's school events, but no church or social activities.  Her anxiety causes constantly racing thoughts.  (*Id.* at 57.)

- She can sit for 15 to 30 minutes before it becomes painful, and she needs to stand up and move around for 5 or 10 minutes.  She has her son carry the laundry and the cat litter, because it is too painful for her to do that.  She thinks she can lift up to 10 pounds without discomfort.  (*Id.* at 59.)

- Since becoming injured, she has gained weight because she is less physically active.  Also, her depression has contributed to her weight gain.  (*Id.* at 60-1.)

The VE testified Pilus had past work as a STNA.  (*Id.* at 69.)  The ALJ then posed the following hypothetical question:

Please assume a hypothetical individual with the same age, education, and work experience as the Claimant. And please assume that that hypothetical individual has the following residual functional capacity. A full range of light work except she can stand and walk four hours in an eight-hour workday.  She can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, and crouch. She can never crawl. She can never reach overhead bilaterally. She must avoid concentrated exposure to extreme cold. She can never operate heavy equipment. With respect to understanding, remembering, and carrying out instructions, she's limited to performing simple routine and repetitive tasks but not at a production rate pace. With respect to the use of judgment, she's limited to work related decisions. There should be no more than occasional changes in the workplace tasks and setting and any changes should be well explained in advance. She should be limited to occasional and superficial contacts with members

12

> of the public. Superficial contact means verbal interaction is not necessary for the
> completion of assigned duties.  Would this hypothetical individual be able to perform
> the past relevant work?

(*Id.* at 69-70.)

The VE testified the hypothetical individual would not be able to perform Pilus' past work as a STNA.  (*Id.* at 70.)  The VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as sorter, inspector packer, or assembler.  (Tr. 70-1.)

The ALJ amended the hypothetical question by reducing the exertional level to sedentary.  (*Id.* at 71.)   The VE testified that such a person could perform jobs such as inspector, assembler, or toy stuffer.  (*Id*.)

In response to questions from the ALJ, the VE testified that normal breaks were two 15-minute breaks and a 30-minute break per workday, normal tolerance for absenteeism was one day per month after the probationary period, and normal tolerance for being off task was less than fifteen percent of the time.  (*Id.* at 71-2.)

In response to questions from Pilus' counsel, the VE testified that an employer usually schedules breaks, and if an employee required flexibility in scheduling breaks up to one-third of the time, they would probably not be able to maintain competitive employment.  (*Id.* at 73.)  The VE also testified that amending the hypothetical to reduce handling to "occasional" would eliminate all the representative jobs.  (*Id.*)  She further testified that, if standing and walking was reduced to two hours, it would eliminate jobs at the light level of exertion.  (*Id.* at 74.)  Finally, the VE testified that the ALJ's limitation to simple, routine, repetitive tasks would not preclude the ability to carry out detailed but uninvolved written and oral instructions.  (*Id.* at 75-6.)

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 & 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) & 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) & 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or

14

medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

Here, Pilus was insured on her alleged disability onset date, July 7, 2017, and remained insured through December 31, 2019, her date last insured ("DLI.") (Tr. 17, 26.) Therefore, in order to be entitled to POD and DIB, Pilus must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The claimant engaged in substantial gainful activity during the following periods: 2017.

3. However, there has been a continuos 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

15

4.    The claimant has the following severe impairments: degenerative disc disease; obesity; an affective disorder; anxiety; and trauma and stressor related disorders.

5.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

6.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: She can occasionally climb stairs and ramps; She can never climb ladders, ropes or scaffolds; She can occasionally stoop, kneel, and crouch; She can never crawl; She can never reach overhead bilaterally; She can never operate heavy equipment; With respect to understanding, remembering and carrying out instructions, she is limited to performing simple, routine and repetitive tasks; With respect to the use of judgment, she is limited to work-related decisions; There should be no more than occasional changes in the workplace tasks and setting, and any changes should be well-explained in advance; She should be limited to occasional and superficial contacts with members of the public. "Superficial contact" means verbal interaction is not necessary for the completion of assigned duties.

7.    The claimant is unable to perform any past relevant work.

8.    The claimant was born on May 2, 1980 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

9.    The claimant has at least a high school education and is able to communicate in English.

10.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

11.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

16

12.     The claimant has not been under a disability, as defined in the Social Security Act, from July 7, 2017, through the date of this decision.

(Tr. 17-26) (internal citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion

17

reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI. ANALYSIS

## A.        Evaluation of the Evidence

Pilus asserts that the ALJ erred by failing to identify the evidentiary basis for his determination that her impairments did not meet the requirements of Listing 1.04. (Doc. No. 13 at 10-11.)  She also asserts that the ALJ's analysis of whether her mental impairments met the requirements of Listings 12.04, 12.06 and 12.15 was incomplete because the ALJ failed to consider the evidence from Carolyn Bing Nieset, her treating therapist. (*Id*. at 11-2.)  She asserts the ALJ erred by failing to assess the impact of her obesity of her RFC in the manner proscribed by SSR 19-2p. (*Id*. at 13-4.)  Finally, she asserts that the ALJ erred in his treatment of the opinion evidence by failing to include all the limitations included in opinions he deemed "persuasive." (*Id*. at 15-6.)

The Commissioner responds that the ALJ's decision included an extensive discussion of the medical evidence concerning Pilus' impairments, which indicates that the ALJ expressly considered the applicability of Listings 1.04, 12.04, 12.06 and 12.15. (Doc. No. 14 at 9-11.)  She argues Pilus has failed to demonstrate that this analysis was lacking in any material way. (*Id*.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a).  Essentially, a claimant who meets the

19

requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, 2015 WL 853425 at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416-17. *See also Harvey v. Comm'r of Soc. Sec.*, No. 16 3266, 2017 WL 4216585 at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'" (quoting *Reynolds*, 424 F App'x. at 416); *Joseph v. Comm'r of Soc. Sec.*, No. 17-4158, 2018 WL 3414141

20

at *4 (6th Cir. July 13, 2018) (same). However, if the claimant does not raise a "substantial question" as to whether a listing was met, by identifying specific evidence that demonstrates a reasonable possibility that an impairment or combination of impairments met or medically equaled the criteria of a listing   the ALJ's failure to evaluate that listing is not reversible error. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432-33 (6th Cir. 2014) (*citing Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Sheek*s, 544 F. App'x at 641-42).

### i.      Listing 1.02

First, Pilus challenges the ALJ's step-three analysis in relation to Listing 1.04 (major dysfunction of a joint).[3] This Listing is defined as follows:

> **1.04     *Disorders of the spine*** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the *cauda equina*) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by

---

[3]     This Listing was eliminated as of April 2, 2021, but was in effect at all relevant times in this case.

> chronic nonradicular pain and weakness, and resulting in inability to
> ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § 404, Subpt. P, App. 1.

> The ALJ provided the following analysis relevant to Listing 1.04:

> The claimant's impairment failed to meet the listing for 1.04 (Disorders of the
> Spine), because the record, consistent with the findings below, does not
> demonstrate compromise of a nerve root (including the cauda equina) or the
> spinal cord with additional findings of: (A) Evidence of nerve root compression
> characterized by neuro-anatomic distribution of pain, limitation of motion of the
> spine, motor loss (atrophy with associated muscle weakness or muscle weakness)
> accompanied by sensory or reflex loss and positive straight-leg raising or; (B)
> Spinal arachnoiditis or; (C) Lumbar spinal stenosis resulting in
> pseudoclaudication. (see 20 CFR Part 404 Subpart P, Appendix 1, § 1.04)

(Tr. 18.)  Pilus asserts that medical record evidence demonstrates that she does, in fact, have a

compromised nerve root, and therefore the ALJ erred in ending his analysis without addressing this

evidence or comparing her condition to the additional requirements of this Listing.  (Doc. No. 13

at 10.)

In *Reynolds v. Commissioner of Social Security*, the Sixth Circuit made clear that an

introduction concluding that a claimant's impairments did not meet or equal a listing, where "no

analysis whatsoever was done."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 (6th Cir.

2011).  The same situation presents itself in this case, as the ALJ has offered no more than a

conclusion that "claimant's impairment failed to meet the listing for 1.04," without offering any

citations to evidence or analysis to support this finding.  (Tr. 18.)  As the *Reynolds* court explained,

"the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and

give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is

impossible to say that the ALJ's decision at Step Three was supported by substantial evidence."

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011), *citing Clifton v. Chater*,

22

79 F.3d 1007, 1009 (10th Cir. 1996); *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir.1999); *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 (3d Cir. 2000). The court explained that, in such a case, "[b]ecause we have no way to review the ALJ's hopelessly inadequate step three ruling, we will vacate and remand the case for a discussion of the evidence and an explanation of reasoning" supporting the determination that the claimant's severe impairments do not meet or medically equal a listed impairment. *Id., citing Burnett*, 220 F.3d at 120.

The Commissioner notes that the ALJ discussed some relevant evidence later in the decision, including a May 2018 MRI showing mild left-sided neural foraminal narrowing at C3-4 secondary to facet degenerative change, and mild spinal canal stenosis; and trigger point injections and medication treatment for back pain; and notes that none of the State agency reviewing physicians who reviewed the record found that she met any Listing. (Doc. No. 14 at 10.) He also cites a plethora additional evidence not noted or discussed by the ALJ that also supports the determination Pilus did not meet or equal Listing 1.04.[4] (*Id*.) However, the ALJ did not relate any of the evidence discussed later in the decision to the specific criteria of Listing 1.04. The Sixth Circuit made clear in a similar case that "[a] district court should not have speculated what the ALJ may have concluded had he considered the medical evidence [cited elsewhere in the decision] under the criteria in Listing 1.02." *Harvey v. Comm'r of Soc. Sec*., No. 16 3266, 2017 WL 4216585, at *6, *citing Thomas v. Colvin*, 826 F.3d 953, 959 (7th Cir. 2016). This is so because, "in dealing with a determination ... which an administrative agency alone is authorized to make, [courts] must judge

---

[4] The Commissioner also asserts that Pilus failed to present evidence showing her impairments met or equaled the Listing. However, the ALJ implicitly acknowledged that the medical record contained enough evidence to require consideration of Listing 1.04 by providing a conclusory dismissal of that listing in his decision.

23

the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Id., quoting Chenery Corp.*, 332 U.S. at 196; *see also Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009).  Therefore, "When an ALJ fails to make a determinative and necessary finding of fact in a sequential step, a reviewing court should not 'fill that gap.'" *Id., citing Getch v. Astrue,* 539 F.3d 473, 481 (7th Cir. 2008).

Because the ALJ committed an error of law, we must vacate and remand, "even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different." *Reynolds*, 424 F. App'x at 414 *(quoting Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 859 (6th Cir. 2011)).  Therefore, the Court recommends that this case be remanded to provide the opportunity for the ALJ to provide an analysis of Pilus' physical impairment under Listing 1.04.

### ii.      Listings 12.04, 12.06 and 12.15

Next, Pilus challenges the ALJ's step-three analysis in relation to three mental health listings: Listings 12.04, 12.06 and 12.15.  (Doc. No. 13 at 11-12.)  However, in contrast to the single paragraph addressing Listing 1.04, the ALJ provided a detailed, two-page analysis citing record evidence and applying it to the "paragraph B" and "paragraph C" criteria.  (Tr. 19-20.)  He compared her medical history and testimony to the Listings, assessing her abilities in the following areas: "understand, remember, or apply information," " interacting with others," "concentration, persistence or pace," and "adapt or manage oneself," which tracks the criteria in that section.  Such

24

an analysis and conclusion regarding Pilus' mental impairment clearly meets the substantial evidence standard.

Pilus argues that the ALJ nevertheless erred because he found the opinions of the State agency reviewing psychiatrists persuasive, and did not discuss the May 22, 2019 opinion of Pilus' treating therapist, Carolyn Bing Nieset, LCSW, in this section. (Doc. No. 13 at 12.) However, the ALJ did address Ms. Nieset's opinion in his step four analysis. He explained "I find Ms. Nieset's opinion unpersuasive. Nothing in her notes supports more than moderate limitations in the ability to maintain attention and concentration." (Tr. 24.) He also argues that the ALJ erred by relying on his Function Statement rather than his hearing testimony. (Doc. No. 15 at 2.)

Since Pilus' claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c. Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations. Of these, supportability and consistency are the most important factors. 20 C.F.R. §§ 416.920c(a), 404.920(b)(2).

In this case, the ALJ identified evidence supporting his determination in each of the four functional areas, explained his analysis of the mental health listings, and addressed the opinion

evidence as follows:

> In the psychiatric review, the State doctor opined that the claimant has a mild restriction in understanding, remembering, or applying information, a mild restriction in interacting with others, moderate difficulties in maintaining concentration, persistence or pace, and moderate difficulties adapting or managing oneself. (Exhibits 3A at 9, 4A at 9). Upon reconsideration, the State doctor opined that the claimant has a mild restriction in understanding, remembering, or applying information, a moderate restriction in interacting with others, moderate difficulties in maintaining concentration, persistence or pace, and moderate difficulties adapting or managing oneself. (Exhibits 5A at 9, 6A at 9). I find these opinions somewhat persuasive as they are generally consistent with the medical record as a whole, as discussed throughout the decision.

(Tr. 20.)

At Step Four, the ALJ nevertheless determined that Pilus had significant mental health

limitations, including:

> With respect to understanding, remembering and carrying out instructions, she is limited to performing simple, routine and repetitive tasks; With respect to the use of judgment, she is limited to work-related decisions; There should be no more than occasional changes in the workplace tasks and setting, and any changes should be well-explained in advance; She should be limited to occasional and superficial contacts with members of the public. "Superficial contact" means verbal interaction is not necessary for the completion of assigned duties.

(Tr. 21.)  While he did not directly address Ms. Nieset's opinion at Step Three, the ALJ did not

overlook it.  At Step Four, the ALJ explained that he evaluated Ms. Nieset's opinion on the most

important factors of supportability and consistency, and identified specific record evidence,

including opinions from the consultative examining psychiatrist and State agency reviewing

psychiatrists, which were in conflict with Ms. Nieset's opined limitations.[5]  Pilus does not identify

---

[5]     While the ALJ deemed the opinion of consultative examiner Dr. Morse "persuasive," he nonetheless adopted a more restrictive RFC determination, explaining he "added limitations to address concerns raised by her therapist."  (Tr. 24.)

26

anything in Ms. Nieset's notes that supports more restrictive limitations, instead relying on her May 2019 statement.[6]  (Doc. No. 19 at 2.)  The ALJ did not err in resolving inconsistencies between Ms. Nieset's May 2019 opinion, Pilus' June 2019 hearing testimony, and other opinion evidence by finding some evidence more persuasive than the other evidence, based on consistency with other medical record evidence.  This meets the lenient standard articulated in the regulations, and therefore, this assignment of error is without merit.

**B.    Credibility Determination under SSR 16-3p**

Pilus asserts the ALJ did not properly evaluate the medical evidence, and his analysis, and did not comply with the requirements of SSR 16-3p.  (Doc. No. 13 at 19.)  She argues that the ALJ cherry-picked evidence in support of his desired conclusion, and disregarded any medical findings which would have precluded her from engaging in substantial gainful activity on a sustained basis, including the limitation in the opinions of the reviewing and examining psychologists that she would need flexibility in taking breaks.  (*Id*. at 19-20.)

The Commissioner responds that the ALJ evaluated Pilus' various pain complaints using the symptom evaluation process described in 20 C.F.R § 404.1529.  (Doc. No. 14 at 17.)  She notes that the ALJ explained why he did not credit the alleged need for flexibility in taking breaks and for

---

[6]    In her Brief, Pilus points to treatment notes stating that she appeared distracted and was having a difficult time dealing with the changes in her life.  (Doc. No. 13 at 16, citing Tr. 547, 552.)  These observations are consistent with the ALJ's finding that Pilus had a moderate restriction in her ability to adapt or manage herself, and the limitation to "no more than occasional changes in the workplace tasks and setting, and any changes should be well-explained in advance."  (Tr. 20-1.)  They do not provide a basis for concluding Pilus would regularly be absent more than one day a month, as Pilus asserts.  (Doc. No. 13 at 16.)

right hand pain, and also explained why the opinion of Ms. Nieset, which included the limitation for breaks, was not credited.  (*Id*. at 18.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983).  However, when a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See, e.g, Massey v. Comm'r of Soc. Sec.*, No. 09 6527, 2011 WL 383254 at *3 (6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[7] 2016 WL 1119029 (March 16, 2016).  Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  *See also Felisky v. Bowen*, 35 F.3d 1027, 1038  39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 834 (6th Cir. June 2005).

---

[7]    SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the April 27, 2016 hearing.

If these claims are not substantiated by the medical record, the ALJ must make a credibility[8] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs*., 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs*., 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms" SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so.").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §404.1529; SSR 16-3p, Purpose, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven

---

[8] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029 at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec*., 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

factors that the ALJ should consider.[9]  The ALJ need not analyze all seven factors, but should show

that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406

F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Pilus' testimony regarding pain in her back and neck, and

weakness in her right arm.  (Tr. 22.)  He noted Pilus testified that she left her job as a STNA at a

Veteran's Home because she "could not do 16 hour shifts, not even 8 hour shifts," could not sit or

stand for long periods of time, and was afraid of dropping a patient due to weakness in her right arm.

(*Id*.)  The ALJ provided a discussion of Pilus' treatment notes, the diagnostic testing, the objective

findings upon examination, the medical opinion evidence, and her self-reported daily activities.  (Tr.

22-4.)  Pilus does not dispute that the ALJ considered the factors enumerated in SSR 16-3p, but

argues this analysis was deficient because the ALJ "cherry-picked" evidence supporting a finding

of non-disability, and ignored evidence that supported a disability finding, specifically, the limitation

that she would need flexibility in taking breaks that was contained  the opinions of the reviewing

and examining psychologists.  (Doc. No. 13 at 19-20.)

---

[9]  The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029 at *7; *see also Cross v. Comm'r of Soc. Sec*., 373 F. Supp. 2d 724, 732  733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

However, the ALJ's decision did address the evidence at issue.  For example, the ALJ noted, "the State doctor opined that the claimant . . . . may need occasional flexibility with breaks when experiencing increased symptoms."  (Tr. 24, citing Tr. 149.)  This observation was made in the context of Dr. Baker's evaluation of Pilus' sustained concentration and persistence limitations. In the same analysis, Dr. Baker found no significant limitations in Pilus' ability to perform activities within a schedule or sustain an ordinary routine.  (Tr. 149.)  Therefore, it was not "cherry-picking" for the ALJ to determine that Dr. Baker's opinion did not support additional limitations regarding breaks.

The ALJ also noted consultative medical examiner Dr. Cooper's opined limitation that Pilus "would be able to perform sedentary type work and work that would allow her the ability to get up as needed from a seated position every two hours or so."  (Tr. 24.)  However, even if the ALJ had adopted this limitation, it would not have been equivalent to Pilus' counsel's proposed limitation that Pilus required "flexibility in scheduling breaks up to a third of the time."  (Tr. 73.)  There is no evidence in the record supporting Pilus' assertion that the actual limitation contained in Dr. Cooper's opinion   standing three times during an eight-hour shift   would be work preclusive.  Further, Dr. Cooper opined in the same analysis that Pilus "would be able to perform sedentary type work," and the ALJ adopted this limitation.

Pilus' also asserts that the ALJ failed to meaningfully discuss her documented right upper extremity impairment.  (Doc. No. 15 at 4.)  The ALJ noted that Pilus testified regarding weakness in her right arm, and identified clinical findings of mild stenosis in Pilus' cervical spine, as well as physical therapy and medical interventions, including nerve blocks, that were prescribed to treat this impairment.  (Tr. 22-3.)  However, the ALJ failed to explain his determination that the only upper

31

extremity limitation supported by this evidence is that Pilus " can never reach overhead bilaterally." (*Id*. at 21.)  Indeed, the ALJ provides no analysis of the evidence relating to Pilus' right upper extremity impairment at all.

The ALJ failed to provide any explanation of his assessment of Pilus' documented right upper extremity impairment.  Although he identified relevant evidence, he did not provide the required "accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) .  Therefore, the undersigned recommends that this case be remanded to provide the opportunity for the ALJ to explain of his analysis of Pilus' right upper extremity impairment.

**C.      Step Five**

Pilus argues that the ALJ's Step Five analysis erred because he "failed to include the limitations as set forth by the reviewing and examining psychologists and the treating source. . . . [and] did not consider the objective evidence in failing to include any limitations on Plaintiff's use of her right upper extremity for handling and fingering."  (Doc. No. 13 at 21.)  This argument is inextricably linked to Pilus' assertions that the ALJ failed to properly evaluate the evidence and assess her credibility.  As discussed *supra*, the arguments relating to the treatment of opinion evidence from the treating psychologists are without merit.  However, for the reasons set forth herein, the undersigned recommends that this case be  remanded to allow the ALJ to explain his analysis of Pilus' right upper extremity impairment.  The undersigned also recommends that, on remand, the ALJ revise his Step Five analysis to reflect any alteration to his conclusions.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further consideration consistent with this Report & Recommendation. On remand, the ALJ should provide an analysis of Pilus' impairments under Listing 1.04, explain his analysis of Pilus' right upper extremity impairment, and revise his Step Five analysis to reflect any alteration to his conclusions at Steps Three and Four.

_s/Jonathan D. Greenberg_

Jonathan D. Greenberg
United States Magistrate Judge

Date:  July 29, 2021

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**